UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| JB&B CAPITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 3:21-CV-00117-DCLC-JEM |
| | ) | |
| v. | ) | |
| | ) | |
| MEDRITE, LLC and LAURA KASPER, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court following a bench trial on October 23, 2023, on Plaintiff's, JB&B Capital, LLC ("JB&B"), breach of contract claim against Defendants, MedRite, LLC ("MedRite") and Laura Kasper ("Kasper"). In accordance with Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law based on the credible evidence presented at trial.[1]

**I. FINDINGS OF FACT**

   **A. The Parties**

JB&B is a Tennessee limited liability company with its principal place of business at 109 S. Northshore Drive, Suite 200, Knoxville, Tennessee 37919. MedRite is a New Jersey limited

---

[1] Neither Defendants nor their attorney of record, Richard D. Gallucci, Jr., appeared at the bench trial. Defendants have not taken any action on the docket since June 5, 2023, when co-counsel for Defendants withdrew from the case [Doc. 58]. Defendants also failed to appear at the October 10, 2023, pretrial conference and have made no effort to communicate with the Court [Docs. 71–72]. And counsel for JB&B indicated that he has not received responses to attorney correspondence from Defendants' attorney since April 2023 [Doc. 72, pg. 1].

1

liability company with its principal place of business at 293A US Route 9 South, Plaza 9, Marmora, New Jersey 08223. Kasper is a resident of the state of New Jersey.

**B.     The Agreement**

In July 2020, MedRite and JB&B entered entered into an Equipment Finance Agreement (the "Agreement") in which JB&B agreed to finance MedRite's purchase of a truSculp ID-8hp personalized, hands-free body sculpting for non-invasive lipolysis (the "Equipment") from Cutera, Inc. ("Cutera") [Doc. 76-1, pgs. 1, 6]. JB&B financed $166,399.69 in return for a 60-month installment schedule note [Doc. 76-1, pg. 1]. The Agreement required MedRite to make three monthly payments at $99.00, followed by 57 monthly payments at $3,613.69 [*Id.*]. Kasper also personally guaranteed (the "Guaranty") payment under the Agreement [Doc. 76-1, pg. 5].

Both the Agreement and Guaranty designated Tennessee's law as the governing law concerning the enforcement of the Agreement, with venue being in either a state court in Knox County or the Eastern District of Tennessee [Doc. 76-1, pgs. 4–5]. The Agreement further authorized JB&B to repossess and sell the Equipment at a public or private sale in the event of default with the proceeds of such sale applied to the outstanding balance [Doc. 76-1, pg. 3].[2] The Agreement and Guaranty further required Defendants to "pay all costs and expenses, including, without limitation, reasonable attorneys' fees . . . plus additional expenses" incurred by JB&B in enforcing its rights under the Agreement [Doc. 76-1, pgs. 3, 5].

**C.     Performance and Damages**

After JB&B issued payment for MedRite's purchase of the Equipment, the Equipment was delivered to MedRite and Kasper. MedRite made the first three payments of $99.00 but then failed

---

[2]     The Agreement also imposed a 10% late charge for any overdue installment payment [Doc. 76-1, pg. 1].

to make any further payments. JB&B then notified MedRite and Kasper that MedRite was in default for non-payment. When neither Defendant cured the default, JB&B repossessed the Equipment and notified MedRite and Kasper that it would sell the Equipment via private sale [Doc. 76-6, pg. 1; Doc. 76-7, pg. 1]. JB&B Special Assets Manager Donaldize Edward Johnson testified that JB&B advertised the Equipment for sale on various publications, but resale was difficult because JB&B had another 15 of the same medical device for which it could not find buyers. Johnson testified that another factor that adversely affected the Equipment's resale value was the manufacturer's warranty, which only applied to the first purchaser of the Equipment unless the Equipment was recertified, which could cost upward of $80,000. JB&B resold the Equipment for $20,000.00. Johnson testified that, given the market conditions, $20,000 was a fair and commercially reasonable price for secondhand equipment of this nature. JB&B notified MedRite and Kasper of the sale of the Equipment and the deficiency owed: $188,429.70 [Doc. 76-9, pg. 1].

JB&B thereafter initiated the instant lawsuit in March 2021 to recover for breach of contract.[3] At the onset of litigation the parties engaged in pleading-stage motions practice, during which Kasper disputed the authenticity of her signature on the Agreement [Doc. 16; Doc. 21; Doc. 16-1, ¶ 7; Doc. 21-1, ¶ 7; *see also* Docs. 40, 41, 42]. As a result of her disputing the authenticity of her signature, JB&B engaged forensic document examiner Khody R. Detwiler to examine

---

[3] JB&B sought to enforce its rights under the Agreement, as well as an amended version of the Agreement [Doc. 48, ¶ 27]. JB&B's forensic document examiner determined that the amended version "cannot contain an independently executed genuine signature of Laura Kasper, but rather a machine produced reproduction of a genuine signature" [Doc. 76-3, pg. 7]. At summary judgment, JB&B indicated that it therefore sought only to recover damages arising under the original Agreement [Doc. 59, ¶ 5 n.1]. However, JB&B's Proposed Findings of Fact and Conclusions of Law purport to recover on both the original and amended Agreement [Doc. 75]. The Court finds it unnecessary to determine whether JB&B can recover under the amended Agreement because the damages claimed are the same regardless of which controls [*See* Doc. 48, ¶ 27; Doc. 59, ¶ 9].

3

Kasper's signatures on the Agreement and comparing that with her known exemplars she produced during discovery. Detwiler testified at the trial that in his expert opinion, stated within a reasonable degree of scientific certainty, Kasper's signatures on the Agreement and Guaranty were "genuine." JB&B's requested damages total $266,266.06, representing "$188,351.20 owed on the balance of the account, $2,458.00 owed in late fees, and $74,456.86 owed in attorneys' fees and costs" [Doc. 73, pg. 1]. This includes $11,025.55 counsel for JB&B advanced to Detwiler for his services [Doc. 77-1, pgs. 4, 7, 22, 34].

The authenticity of Kasper's signature has been the central disputed fact in this case. The Court finds the testimony of the forensic document examiner to be credible. Detwiler has over 14 years of experience as a forensic document examiner [Doc. 76-3, pg. 43]. Detwiler completed the standard minimum training requirements for forensic document examiners, with subsequent technical training in ink and indentation analysis, photography and digital imaging, security paper, and printing process identification and image analysis [Doc. 76-3, pgs. 43–45]. Detwiler has received regular continuing education in various aspects of forensic document examination [*See* Doc. 76-3, pgs. 45–54]. Detwiler is a member of various professional organizations in the field of forensic document examination, including the American Society of Questioned Document Examiners [Doc. 76-3, pg. 56]. And Detwiler has provided expert testimony in 53 court cases and legal proceedings [Doc. 76-3, pgs. 26–53].

Detwiler analyzed the original Agreement and Guaranty bearing Kasper's signature, the Schedule describing the Equipment; an IRS Form W-9 Request for Taxpayer Identification Number and Certification; an Automated Clearing House Authorization; a disbursement authorization form; and a completed JB&B credit application [Doc. 76-3, pgs. 3, 58–72]. These documents contained seven signatures in total. Detwiler also received 30 exemplars of Kasper's

known signatures. Detwiler then subjected the signatures to comparative analysis and print process examination. Detwiler testified that he compared the 30 known exemplars with one another and found that they demonstrated a "consistent and relatively wide range of natural variation" that could serve as comparators for purposes of Kasper's purported signatures on the Agreement documents. Detwiler then compared the exemplars with those on the Agreement and testified to significant similarities in letter construction, letter formation, letter sequence formation, letter slant, proportion and height relationships, letter spacing habits, and writing skill and ability. Detwiler also determined from visual and microscopic examination of the signatures on the Agreement documents that the signatures were "executed with original, black-colored ball point writing ink and exhibit natural line quality characteristics," which was consistent with "naturally and spontaneously prepared signatures or writings" [Doc. 76-3, pgs. 15, 20–21]. And Detwiler conducted an indentation analysis the results of which showed that the Agreement documents were signed one on top of another, which was consistent with a single transaction in which multiple documents were signed in succession [Doc. 76-3, pgs. 20–21]. Given the degree of similarity with the exemplars and natural execution characteristics of the signatures on the Agreement documents, Detwiler opined that Kasper herself signed the Agreement and Guaranty. The Court gives Detwiler's opinion great weight and finds that Kasper's signatures on the Agreement, Guaranty, and related documents are genuine. The Court also finds that Medrite and Kasper are in default for failure to pay in accordance with the Agreement and Guaranty.

## II. CONCLUSIONS OF LAW

A claim for breach of contract has three elements: the existence of a valid and enforceable contract; a breach; and damages caused therefrom. *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). Each element must be established by a preponderance of the evidence. *See*

*Next Generation, Inc. v. Wal-Mart, Inc.*, 49 S.W.3d 860, 864 (Tenn. Ct. App. 2000). A valid and enforceable contract requires: (1) adequate consideration; (2) mutual assent to its terms; (3) the absence of fraud or undue influence; (4) sufficiently definite terms; and (5) no violation of public policy. *See Doe v. HCA Health Servs. of Tenn.*, 46 S.W.3d 191, 196 (Tenn. 2001).

### A. Liability and Damages

The Court finds that JB&B has met its burden to prove all essential elements of its breach of contract claim. A review of the Agreement confirms adequate consideration, in that JB&B financed MedRite's purchase of the Equipment from Cutera in exchange for Medrite paying JB&B back in installments [Doc. 76-1, pg. 1; *see In re Estate of Brown*, 402 S.W.3d 193, 200 (Tenn. 2013) ("Mutual promises are sufficient to constitute consideration.")]. And adequate consideration supports Kasper's Personal Guaranty because the Guaranty was part of the consideration on which JB&B relied to extend financing to MedRite [Doc. 76-1, pg. 5; *S.M. Williamson & Co. v. Ragsdale*, 95 S.W.2d 922, 925 (Tenn. 1935)]. Kasper's signature, individually and in her capacity as member of MedRite, establishes mutual assent [Tenn. Code Ann. §§ 48-238-103(a), 48-429-402(a); *Moody Realty Co. v. Huestis*, S.W.3d 666, 674 (Tenn. Ct. App. 2007)]. There is no evidence of fraud or undue influence. The terms of the contract are sufficiently definite. And nothing about the Agreement and Guaranty violates public policy. *See Baugh v. Novak*, 340 S.W.3d 372, 383–84 (Tenn. 2011). Thus, there is a binding and enforceable contract.

MedRite's non-payment of the fourth installment payment constituted a breach of the Agreement [Doc. 76-1, pgs. 3–4; Doc. 76-11, pg. 1]. Kasper's failure to pay the full outstanding sum of the Agreement and the deficiency after the commercially reasonable private sale of the Equipment constituted a breach of her obligations under the Guaranty [Doc. 76-1, pg. 5; Doc. 76-4, pg. 1; Doc. 76-5, pg. 1; Doc. 76-8, pg. 1]. There is no evidence in the record that would suggest

6

the JB&B resale of the Equipment after foreclosure was not commercially reasonable. Thus, JB&B's actions are presumed compliant with the requirements of Article 9 of Tennessee's Uniform Commercial Code. Tenn. Code Ann. § 47-9-926(1) ("A secured party need not prove compliance with the provisions of this part relating to collection, enforcement, disposition, or acceptance unless the debtor or a secondary obligor places the secured party's compliance in issue."). JB&B was damaged as a result of Defendants' breach of their obligations under the Agreement and Guaranty in the total amount of $190,809.20. JB&B is also entitled to recover expenses, including reasonable attorney fees incurred in enforcing its rights under the Agreement and Guaranty [Doc. 76-1, pgs. 3, 5]. And JB&B is entitled to recover the costs of Detwiler's expert services, as those services and the fees Detwiler charged were reasonably necessary in light of the dispute over the authenticity of Kasper's signature [*Id.*].

B.  **Calculation of Attorney Fees**

"In diversity cases, attorneys' fees are governed by state law." *Hometown Folks, LLC v. S&B Wilson, Inc.*, 643 F.3d 520, 533 (6th Cir. 2011). Tennessee has no fixed mathematical formula for how to determine reasonable attorney fees and costs; rather, the Court must determine the reasonableness of the claimed amounts based on the particular circumstances of the individual cases. *Killingsworth v. Ted Russell Ford, Inc.*, 104 S.W.3d 530, 534 (Tenn. Ct. App. 2002). This analysis is guided by the factors outlined in Tennessee Rule of Professional Conduct 1.5. Tenn.Sup.Ct.R. 8, Rule 1.5(a); *In re Estate of Fetterman v. King*, 206 S.W.3d 436, 440 (Tenn. Ct. App. 2006).

JB&B seeks to recover $75,456.86 in attorney fees and expenses related to this case [Doc. 77, pgs. 1–2]. Deducting the expert fees, the amount of attorney fees claimed totals $64,431.31, representing hours billed for work performed by attorneys Gregory Logue ($325/hour), Lindy

Harris ($265/hour), and Kaitlin Tweel ($250/hour), who practice out of Knoxville, Tennessee [Doc. 77, pg. 2]. Attorney Logue is a member of Woolf, McClane, Bright, Allen & Carpenter, PLLC ("Woolf"), was admitted to the Tennessee bar in 1986, and billed for 89.1 hours in connection with this case.[4] Attorney Harris is a member of the same law firm, was admitted to the Tennessee bar in 2010, and billed for 52.8 hours. And Attorney Tweel is an associate in the same firm, was admitted to the Tennessee bar in 2017, and billed 90.3 hours.

The Court finds all three rates in line with fees customarily charged by attorneys with similar experience and ability in the Knoxville area. Tenn.Sup.Ct.R. 8, Rule 1.5(a)(3); *see, e.g.*, *Vanderhoef v. Dixon*, No. 3:16-CV-00508, 2020 WL 4673464, at *3 (E.D. Tenn. Aug. 12, 2020) (concluding that a rate of $350 per hour was reasonable for an attorney with 14 years of experience in the Knoxville area); *Knox Trailers, Inc. v. Clark*, 2022 WL 4372350, at *4 (E.D. Tenn. Sept. 21, 2022) (finding $250 per hour reasonable for a Knoxville attorney with six years of experience and $275 per hour appropriate for a Knoxville attorney with nine years of experience). The Court further finds that the hours billed for were reasonable and necessary, given the age of the case, the motions practice that characterized the pleading stage, and Defendants' lack of cooperation since the latter stages of discovery. Thus, the Court finds an award of attorney fees in the amount of $64,431.31[5] and a award of expert expenses in the amount of $11,025.55 reasonable and necessary to enforce JB&B's rights under the Agreement.

---

[4] The Court takes judicial notice of counsel's bar license and law-firm profile. *See Paulson v. Guardian Life Ins. Co. of Am.*, 641 F. Supp. 3d 1, 8 n.5 (S.D. N.Y. 2022) (taking judicial notice of law firm website).

[5] The Court previously awarded JB&B reasonable costs associated with Kasper's failure to attend her deposition [Doc. 65]. The Court's award of attorney fees in this Memorandum Opinion and Order includes an award for those costs [*Compare* Doc. 70-1, *with* Doc. 77-1, pgs. 8–10].

### III. CONCLUSION

For the above-discussed reasons, the Court finds that JB&B is entitled to a judgment against MedRite and Kasper, jointly and severally, in the amount of $266,266.06. A separate judgment shall enter.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge